IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
_____

**FILED**

**March 30, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

**MARY WIER COMPTON DEAN,**    )
    )
    Petitioner/Appellant,    )    Davidson Probate No. 91D-633
    )
**v.**    )
    )    Appeal No. M1998-00052-COA-R3-CV
**JOHN STOTLER COMPTON,**    )
    )
    Respondent/Appellee,    )
    )
and    )
    )
**FRANK WIER and wife,**    )
**LESLIE WIER,**    )
    )
    Respondents/Intervenors/Appellees    )

APPEAL FROM THE PROBATE COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE FRANK G. CLEMENT, JR., JUDGE

For the Petitioner/Appellant:              For the Respondent/Appellee,
                                       John Stotler Compton:

John B. Link, III                            Clark Lee Shaw
Nashville, Tennessee                      Nashville, Tennessee

For the Respondents/Intervenors/Appellees,
Frank Wier and wife, Leslie Wier:

Anne Russell
Mary J. Chukinas LaGrone
Nashville, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

**OPINION**

This is a post-divorce child custody case. The trial court found that neither parent was able to care for the minor children. It awarded joint custody of the children to the maternal grandparents and the father, with physical custody to the maternal grandparents. The mother and father now appeal. We affirm, finding that the evidence supports the finding that substantial harm would result to the children from an award of sole custody to either the mother or father, and that the best interests of the children are served by the custody award made by the trial court.

Petitioner/Appellant, Mary Wier Compton Dean ("Mother"), and Respondent/Appellee, John Compton ("Father"), married in November 1986. They had two children, Frank, born May 23, 1987, and Gabriel, born May 15, 1989. The family lived in Nashville, Tennessee. At birth, Gabriel suffered a stroke which resulted in cerebral palsy with partial paralysis. When he was approximately one and one-half years old, he underwent several surgeries to correct a breathing problem. Gabriel currently requires a substantial regimen of therapies for his condition.

Mother and Father separated in February 1991. On February 19, 1991, Mother filed a complaint for divorce in the Davidson County Probate Court. In the divorce complaint, Mother alleged that Father was an alcoholic and that his behavior had caused Mother and the children mental and physical anguish. Mother sought alimony, sole custody of the children, and child support. Soon after Mother filed her complaint for divorce, she filed a motion requesting that the trial court allow the children to reside with her parents, Respondents/Intervenors/Appellees, Frank and Leslie Wier ("Grandfather" and "Grandmother" or collectively "Grandparents"), at their home in Sevierville, Tennessee.

On March 28, 1991, the Grandparents filed an intervening motion seeking temporary custody of the two children. On April 3, 1991, the trial court allowed the Grandparents to intervene in the case as parties and granted custody of the children to the Grandparents "during the pendency of this action." The trial court granted Father supervised visitation, provided he did not consume alcohol before or during visitation.

Two weeks after receiving temporary custody of the children, the Grandparents filed an intervening petition requesting permanent custody of the children. In the petition, the Grandparents alleged that both Mother and Father had failed to provide for the children and that the Grandparents had been forced to assume responsibility for the children's needs. The Grandparents stated that they had provided a stable and nurturing home to the children and that they should, therefore, be awarded

permanent custody of the children. The Grandparents also sought a restraining order to prevent Mother from removing the children from Tennessee, citing statements by Mother that she intended to move the children to North Carolina to live with her and her then-boyfriend, Owen Dean ("Dean"). Mother began a relationship with Dean shortly before she separated from Father, and the relationship continued after her divorce from Father was final. Mother eventually married Dean in September 1991, one week before the initial hearing to determine custody of the children.

On April 19, 1991, the trial court issued a temporary restraining order enjoining Mother from removing the children from the Grandparents' custody. Both Mother and Father filed separate motions contesting the order and seeking custody of the children. In her motion, Mother argued that she had placed the children in the Grandparents' custody only so that she could move to North Carolina and establish a new home for the children. She asserted that the Grandparents were petitioning for custody only to prevent Mother from moving out of Tennessee. In his motion, Father asked that the children be placed in his custody at his mother's home in Nashville, where Father was living at the time, until the trial court was able to make a final custody determination.

On May 17, 1991, the trial court entered an order denying both parents' motions for custody. It found that the children's best interests were served by maintaining custody with the Grandparents pending a final custody hearing, but granted both Mother and Father visitation. Both parents were ordered to pay child support to the Grandparents.

On July 3, 1991, the trial court entered a final decree of divorce. The decree reserved and set for trial the issues of child custody and child support. Two months later, on September 9, 1991, the trial court held a hearing to determine custody of the children. After the hearing commenced, the parties announced to the trial court that they had reached an agreement concerning custody. In accordance with the parties' agreement, the trial court ordered that custody of the children would "continue to be vested in [the Grandparents] at this time and [that the children] shall continue to reside in Sevierville, Tennessee." The trial court granted both parents visitation to be set in the Grandparents' discretion based on the children's best interests and therapy needs. The trial court enjoined Mother from demeaning the Grandparents in the children's presence, from enticing or confusing the children, and from discussing custody or living arrangements with the children.

After this initial award of custody to the Grandparents, the relationship between Mother and the Grandparents became increasing hostile. Over the next seven years, Mother repeatedly

2

petitioned the trial court to modify its September 1991 custody award and to grant her custody of the children. As discussed below, in response to Mother's repeated petitions, the trial court entered three separate custody orders following its initial custody award, all maintaining the Grandparents' custody of the children.

On March 11, 1992, Mother filed her first petition to modify the custody award. In the petition, Mother alleged that, since the September 1991 custody order, she had remarried, established a home in North Carolina, and started a business with her new husband, Owen Dean. Mother claimed that she was a fit parent, fully able to care for the children, and that no reason existed to continue custody with the Grandparents. Both Father and the Grandparents opposed Mother's petition for custody.

On December 17, 1992, in preparation for a hearing on Mother's petition for custody, the trial court appointed Thomas Ware ("Ware") as guardian *ad litem* for the children. A month later, both Mother and Dean met with Ware. During the meeting, Mother told Ware that she was in a stable and loving marriage with Dean and that she had a successful business in North Carolina. In reality, after Mother married Dean, he became verbally and physically abusive toward Mother and refused to allow Mother any of the proceeds from the couple's business. Two months after her meeting with Ware, Mother left Dean and admitted herself to a psychiatric hospital. Mother told hospital officials that Dean was "extremely controlling . . . domineering" and that she "felt like a prisoner" in her own home. She said that she did not want to leave Dean because she felt that being married would improve her chances of getting custody of the children. Eventually, in October 1993, Mother separated from Dean. The couple divorced in December 1994.

Without benefit of the information concerning Mother's marital and financial problems, Ware submitted his guardian *ad litem* report to the trial court. In the report, dated October 1993, Ware stated that Mother apparently had a more stable lifestyle. He said that he could not find "as a matter of law, that either [Mother] or [Father] is an unfit parent."

Ware's report detailed the special needs of the parties' sons and the care they had received from the Grandparents. The children began living with the Grandparents when Frank was four years old and Gabriel was seven months old. Ware's report was submitted over two years later. Ware related that Frank's child psychologist described Frank as "a troubled young child" and attributed Frank's problems to his exposure to trouble between his parents, such as observing "fighting" and

3

seeing his father arrested. Ware reported that the psychologist said it would be "disastrous" to remove Frank from the Grandparents' home "just as some sense of stability in the child's life has arisen."

Ware also described Gabriel's difficulties and his therapy regimen. After Gabriel suffered a stroke at birth, he was given a small chance of survival. He received extensive medical treatment and made "tremendous progress" in overcoming his physical handicaps. Gabriel received physical, occupational and speech therapy, and also participated in swimming, horseback riding and soccer as part of his therapy.

The guardian *ad litem* described the children's situation with the Grandparents:

> Since the minor children have resided with [the Grandparents], they have received tremendous love and support. In addition, both children have received an almost unlimited amount of professional assistance and treatment, including psychological assessments and follow-up. Gabriel Compton has also received tremendous amounts of physical, occupational and speech therapy as a result of his handicaps from birth, and he has illustrated tremendous increases in his functional abilities, although he has a great distance to improve in the future.

Ware described the efforts required to tend to the children's special needs:

> . . . [T]he time and attention necessary to provide these two (2) young boys with the medical care and attention they require is extraordinary. [Grandmother] has given up her prior occupation in order to transport the children to the various physicians, psychologists and other medical professionals, in addition to their educational and social activities. [Grandfather] has arranged to move his office into his home, so as to allow him to be available for these tasks. After reviewing the situation, it is the opinion of your Guardian Ad Litem that it would be impossible to attend to the children's requirements and work outside of the home, in light of the extensive medical treatment needed.

In view of these considerations, Ware recommended that physical custody of the children remain with the Grandparents.

On February 8, 1994, approximately two weeks prior to the scheduled hearing on Mother's petition for custody, the parties agreed to a settlement. The agreement maintained custody with the Grandparents. However, Mother subsequently refused to sign the order setting forth the agreement and instead proposed a new order which significantly differed from the prior agreement. The Grandparents refused to sign Mother's proposed order, and Mother's petition was rescheduled for hearing.

After a series of discovery disputes, clashes over visitation, and battles over child support, trial began on March 13, 1995, on Mother's first petition for custody. After the first day of testimony, the parties asked for a recess. The recess was granted, and the parties later returned with

4

an agreed order. In the order, the parties agreed that their ultimate goal was to work toward an enhanced relationship between Mother and the children and between Mother and the Grandparents "to such an extent that the children's best interests would be served by having [Mother] serve in the role of primary custodian for the children." The order stated that "custody of the minor children shall be vested with [the Grandparents,]" but directed each of the parties to participate in a mediation process with a psychologist, Dr. Jay Woodman ("Dr. Woodman"). The parties agreed to waive litigation of custody so long as the process was ongoing. Mother and Father were permitted visitation and were ordered to pay child support. Mother, Father and the Grandparents were ordered to bear the expenses for the services of Ware and Dr. Woodman. The trial court ordered Mother to pay the costs incurred in the case by each of the parties.

On December 28, 1995, nine months after the agreed order, Mother filed her second petition to modify the trial court's custody award and to award custody to her. In the petition, Mother alleged that Dr. Woodman had been ineffective in resolving the conflicts that existed between Mother and the other parties. Mother also asserted that the Grandparents had been uncooperative and had refused to allow Mother visitation or telephone contact with the children. Both the Grandparents and Ware filed answers opposing to Mother's petition. The answers denied that Dr. Woodman had been ineffective or that the Grandparents had prevented contact between Mother and the children. The Grandparents and Ware argued that the best interests of the children were served by maintaining custody with the Grandparents.

Despite the fact that her second petition to modify custody was pending in the Davidson County Probate Court, on October 27, 1997, Mother filed a petition to modify custody in the Davidson County Circuit Court. In the Circuit Court petition, Mother sought sole custody of the children. Mother also filed in Circuit Court motions to vacate the Probate Court's restraining order, to extend visitation, to allow Mother access to the children's teachers and health care providers, for access to the children by Mother's attorney, and for a mutual restraining order. On November 17, 1997, the Circuit Court issued a terse order transferring the case back to the Probate Court.

Another series of disputes ensued over discovery, visitation, and child support arrearage. Mother's second petition for custody was set for trial in the Probate Court on August 5, 1998. The parties were ordered to proceed on an expedited discovery schedule. Approximately three weeks before the trial date, the Grandparents filed a motion to compel Mother to answer interrogatories and

5

produce documents. Five days before the trial date, a hearing was held on the Grandparents' motion to compel. After the hearing, the trial court found that Mother had been "obstructive in discovery over the history of this case" and that her lack of cooperation during discovery would support a continuance. Nevertheless, the trial court ordered the trial to proceed as scheduled with the inadequacy of discovery going to credibility as well as the extent to which evidence would be viewed.

On August 5, 1998, the trial commenced on Mother's second petition for custody. At the outset, Father's attorney stated that Father had decided to ask the trial court to make an award of "shared" custody between Father and the Grandparents. Father stated that he realized that the Grandparents had been the children's primary caretakers, that they had provided the children with a stable environment, and that a continued relationship with the Grandparents would be in the children's best interests. Father stated that he had a good relationship with the Grandparents and could work with them on matters regarding the children's interests. He testified that he would take sole custody of the children if the trial court made such an award; however, he admitted that he alone would not be able to provide adequate care for the children. Father stated that he would encourage his mother, the Grandparents, and Mother to assist him if he were awarded sole custody.

In his testimony at trial, Father acknowledged that he had had problems with alcohol since 1982 and that he had been in treatment several times for his problem. He stated that he had been "active" in Alcoholics Anonymous since 1982 and that he had not consumed alcohol since December 1997.

Father admitted that he failed to exercise regular visitation with the children from 1995 to 1998. He testified that he stopped seeing the children because the trip to the Grandparents' home became increasingly difficult and because he was busy starting a business and building a house. Father also stated that he had to "step away" from the children because he needed the time to "regroup" to prevent himself from ". . . [back sliding] in [his] mental thinking and mental health." Father told the trial court that he did not believe that such a "back slide" would happen again. Father testified that he had always been on good terms with his children and that he saw them some weekends from 1995 to 1998 when Mother brought them to visit Father at his home. He eventually ended these visits when he realized that Mother was using the visits to get information to use against the Grandparents.

6

Father testified that he was living in Cheatham County, Tennessee, and had worked as an electrical contractor for the past ten years. At the time of trial he lived in a one-bedroom trailer, but testified that he was building a house where he and the children could live if he were granted custody. Father asserted that his mother could help take care of the children while Father worked, although his mother lived in east Nashville. Father testified that he thought the children would continue to be covered by TennCare medical insurance if he were awarded custody. He also stated that he had applied to his own private medical insurance provider for coverage for the children but that his provider would not extend coverage until Father was awarded custody.

Father testified that Mother had discussed with him some aspects of her financial situation, including the fact that she had been forced to deal in cash and hide assets to avoid garnishment of her wages, that she planned to file for bankruptcy, and that she planned to pay for her house by using her Social Security Number to transfer money to an off-shore account.

Mother also testified at the hearing. Mother testified that she was living in North Carolina and running her own insurance business. At the outset of her testimony, she stated that, "while [the Grandparents] go to bed and get up on a regular basis, their psychological atmosphere is not stable." Mother described the Grandparents as a "classic dysfunctional family" and she claimed that they had attempted to "control" her life since she was a teenager. Mother asserted that the Grandparents originally petitioned for custody of the children to force her to stop seeing Owen Dean. She testified that Grandfather told her after she divorced Dean that the only way he would allow her to have custody of the children was if she were married or if she moved back in with the Grandparents. Mother accused Father and Dean of conspiring against her in her efforts to gain custody of the children. She asserted that she would never give up trying to get custody of her children.

Mother testified that she had exercised visitation regularly and had remained involved in the children's lives since they were placed in the Grandparents' custody, even though she had lived in North Carolina during the entire period. She testified that she had a good relationship with the children and that she was able to care for their special needs. Mother claimed that Father was not patient or tolerant with the children and that he did not "seem to be able to spend long periods with them . . . without losing control . . . ."

Mother testified that she signed a contract to purchase a home in North Carolina for $157,000 because she believed that the trial court would be more likely to award her custody if she owned a

7

home. She stated that she had investigated the school system in North Carolina and had made arrangements for the children to be enrolled. Mother testified that the children would be covered under her group medical insurance if she were granted custody, regardless of their pre-existing conditions. She stated that the coverage would pay for Gabriel's physical therapy as well as some of the counseling for both of the children.

Mother testified that when she was a teenager she was diagnosed as suffering from obsessive compulsive self-destructive neurosis, and that she had seen psychiatrists regularly since then. She acknowledged that she had taken the prescription drug Pamelor for depression for several years. Mother also testified that she had diabetes since childhood and that she must monitor her blood sugar level throughout the day and take three or more injections of insulin per day. She acknowledged that her diabetes had caused complications to her health throughout her life.

Mother testified that she did not pay child support on a regular basis from 1991 to 1996 because she did not have the money. She claimed that, at the time of trial, her average income from her insurance business, her sole source of support, was approximately $3,200 per month. Mother incorporated her insurance business in March 1996, two days after a judgment was entered against her for back child support. She admitted that the business had not filed a corporate tax return since its incorporation. When asked if she had misrepresented her financial status in documents she submitted as the business's personal representative, Mother asserted her Fifth Amendment right against self-incrimination.

Mother admitted that she had judgments outstanding against her in the amount of $12,700 for back child support, in the amount of $4,000 for student loans, and in the amount of $1,000 for medical bills. She acknowledged that she owed approximately $27,000 in attorney's fees, $10,000 on a personal loan, $1,000 on signature loans, approximately $5,000 in fees to the guardian *ad litem*, and $2,500 in fees to Dr. Woodman for mediation expenses. Mother admitted that she had not paid any individual income taxes from 1993 to 1997. She estimated her individual tax liability at somewhere between $20,000 and $25,000, though she failed to disclose the debt in discovery documents. She asserted that she had made an offer of compromise with the Internal Revenue Service to settle her tax debt, but she had no documentary evidence of the offer.

During Mother's testimony, the trial judge asked her numerous pointed questions about financial and other matters. He asked her why she had failed to pay child support regularly, resulting

8

in a large arrearage, whether she incorporated her insurance business to avoid paying child support, why she signed a contract to purchase a $157,000 home if she could not afford to pay child support, why she expected to receive child support from Father if his income was less than hers and she purportedly could not afford to pay, why she had not resolved her tax problems, and why she had filed conflicting affidavits on her income and expenses. The trial court commented:

> It looks to me like you've given testimony, on a number of occasions in this court, during hearings and affidavits and interrogatories, and that you seem to be saying whatever you need to say at the time, especially concerning your finances but not limited to your finances.
>
> You don't make any money, if they are trying to make you pay child support and you understate your income, but if you're trying to get your children, then your income is a whole lot better. Then your expenses are one way, in one situation, and they appear to be another way in another situation.

A hearing was held to hear testimony from David Mensel ("Mensel"), a certified public accountant and fraud examiner, concerning Mother's personal and business finances. Mensel testified that there were "serious absences" in the information Mother provided and that it was frequently impossible to reconcile Mother's tax returns with the other documents she provided. Mensel noted that it was obvious that Mother had serious tax deficiencies in at least three years from 1994 to 1998, but that she did not produce enough information to determine the magnitude of the problems. Mensel testified that there was no way to determine whether Mother had the money to purchase a house from the documents she provided; however, Mensel stated that the documents that Mother did provide showed so little net income that he did not see how she could survive. Mensel testified that Mother's failure to produce the most basic financial documents and her inability to attribute a source to her predominantly cash income were "badges of fraud."

Grandmother also testified at the hearing. She stated that she and Grandfather agreed to take custody of the children after Mother and Father's separation because the Grandparents felt that the children were not receiving the care that they needed from Mother and Father. Grandmother stated that she and Grandfather had been taking care of the boys and helping Mother financially for years prior to the separation. She testified that when they took custody of the children they hoped that Mother would eventually be able to reassume custody and care for her children on her own. Grandmother testified that she and Grandfather had since lost such hope.

Grandmother admitted that she and Grandfather had had a contentious relationship with their daughter for many years and that none of them can speak to each other without expressing anger.

9

Grandmother denied that she and Grandfather tried to "control" Mother's life. Grandmother stated that, in contrast to their relationship with their daughter, she and Grandfather are generally able to cooperate with Father concerning the children's care. She testified that they had occasionally gone hiking and picnicking with Father and the two children. Grandmother asserted her belief that she and Grandfather would continue to be able to work with Father on matters involving the children.

Grandmother testified that she quit her job when she and Grandfather assumed temporary custody of the children so that she could care for the children full-time. At the time of trial, Grandmother was sixty-six years old and Grandfather was sixty-eight years old. Grandmother stated that she and Grandfather had no major health problems. She stated that, at the time of trial, neither she nor Grandfather worked, and that both help care for the children.

Grandmother testified that both Frank and Gabriel require special medical and psychological care. Grandmother testified that, since the Grandparents received custody of the children, they had paid for 708 professional appointments for the boys and had participated in 1,092 home therapy sessions for Gabriel. Both Frank and Gabriel have severe allergies and must receive regular injections. Both children participate in psychological counseling. In addition, Gabriel currently receives special orthopedic and neurological care because of his cerebral palsy, and he must also receive long-term occupational, physical, and speech therapy. Grandmother stated that the children were covered under the Grandparents' health insurance and under TennCare and that Gabriel received SSI benefits because of his cerebral palsy. Grandmother asserted that the children would be ineligible to receive these benefits if they were removed from the Grandparents' custody. Grandmother also testified that the cost of providing the children with health insurance coverage was $531.04 per month, even with the all of the benefits the children received.

Grandmother testified that both Frank and Gabriel were doing well in school. She stated that Gabriel was an honor roll student and that he received a perfect attendance award, and that Frank had maintained a "solid B, B minus average." Both children also participated in several sports and activities in accordance with their psychologist's recommendations.

Dr. Robert Wahler ("Dr. Wahler"), the children's psychologist, testified at the hearing. Dr. Wahler testified that Frank suffers from oppositional/defiant disorder and social phobic reaction. Dr. Wahler emphasized that Frank needed a structured and disciplined environment to be productive. Dr. Wahler noted that Gabriel is the better adjusted of the two children despite his physical

10

challenges. Dr. Wahler stated that Gabriel is more thoughtful and objective than Frank and more capable of seeing the big picture.

Dr. Wahler testified that, in light of the children's history, changing custody from the Grandparents would be a "very difficult transition and one that is fraught with . . . questions about what the future would bring." He emphasized that both boys needed continuity and stability in their family lives. In addition to Gabriel's physical difficulties, Dr. Wahler testified that stability and continuity were particularly important for Frank, given his psychological and emotional problems. Dr. Wahler testified:

> It is very difficult, with someone like Frank, to develop any kind of steady progress, unless there is absolute continuity in his family life.
> * * *
> [Continuity and stability are] important for all children, but particularly with Frank, because if things are not fairly predictable for Frank, he infers that people are against him and he reacts to that.
> * * *
> There has to be this stable parental care, in which the parents in question must have patience, tolerance, firmness and predictability. Under those conditions, I think Frank has an opportunity to begin to start being a responsible citizen and someone who begins to feel better about his own competence.
> * * *
> [The Grandparents have] always been very dependable, very sensitive to the boys' needs and willing to step forward and set . . . limits on Frank, even though, I think, emotionally, it has been draining on both of them . . . . [Without such limits,] I cannot imagine [Frank] getting into adolescence without getting into a great deal of trouble and certainly not achieving very much at all in life.

Dr. Wahler testified that the person with custody of Frank and Gabriel should have patience, tolerance, firmness, predictability, and should be able to cooperate with the Grandparents. He indicated that the children should have contact with both parents, but noted that it would be very difficult for a single parent to properly care for the children's needs.

Asked about whether the children had expressed any preferences concerning custody, Dr. Wahler testified that Frank "goes back and forth" on where he wants to live. Dr. Wahler believed that Frank was looking for the "best deal." Dr. Wahler stated that Gabriel, on the other hand, believed that the Grandparents provide the best environment for him. Dr. Wahler told the trial court that it was more likely that Gabriel's testimony would reflect his own, independent views than would Frank's testimony.

Frank and Gabriel talked to the trial judge in his chambers. Frank said that he thought that he might like to live with Father because he likes hunting, fishing and target practicing with Father. He also stated that he enjoys playing sports while living with the Grandparents, and said that he was

11

not sure that he would be able to play sports if he lived with Mother. When asked with whom he would prefer to live, Gabriel testified that he "likes things the way they are." Gabriel predicted that Frank would say that he wanted to live with Father because he could fish and have his own gun if he lived with Father.

After five days of testimony, the trial court entered its custody decree. The trial court rendered an oral ruling which was reproduced in its written order. The trial court stated:

> The Court has little faith in anything Ms. Dean has said; it finds her testimony to be a matter of convenience. She says what is in her best interest at the time and, if something wasn't done right, its [sic] somebody else's fault.
>
> The Court is not here to say that Ms. Dean is a bad person because the Court does not believe that, but the Court is here to say that she doesn't act responsibly.
>
> These two children must have an adult who acts responsibly, who is responsible for their day-to-day care.
>
> It is critical for everyone in this room to know that the Court is finding that Ms. Dean's testimony lacks credibility and that she is unable to manage her affairs, whether it be financial, whether it be taxes, whether it be business, whether it be personal, that she simply cannot manage her affairs. For those reasons, she is simply not the proper person to have custody of these children on a full time basis.
>
> It is important to say that the Court is not saying she is a bad person. There's a huge difference, huge difference.
>
> Between Ms. Dean and John Compton, there's no question, in the Court's mind, that John Compton would be the better of the two parents to have custody. Its [sic] not even close at all. So, between those two parents, John Compton would be the preferred parent.
>
> The Court does find that John Compton, at the moment, does not have the means, the residence, the facilities, the economic where-with-all and, perhaps, not the emotional stamina to be the full-time custodian of his children. The Court does think has a lot going for him and he has done a lot to rehabilitate himself, and is a good parent or is capable of being a good parent and should be rewarded, in that regard.
>
> However, the Court does not think that Mr. Compton can maintain a full-time job, live in Cheatham County, his mother living in East Nashville, and try to provide everything that these children need. The Court believes that these children have special needs and those special needs compel that the Court allow physical custody of the two boys to remain with Frank and Leslie Wier, but the Court is going to grant joint custody to John Compton and Frank and Leslie Wier.
>
> The Court thinks that this respects the parental rights in finding John Compton the more appropriate of the two parents to have custody of the children, at the same time, recognizing that the best interests of these children are served by staying with their grandparents, Frank and Leslie Wier, in Sevierville, for the bulk of the time.
>
> The joint custody will require cooperation between John Compton and the Wiers, in certain decision making efforts, but the physical custody shall remain with the Wiers.
>
> Another very critical element in all of this is that, with a few exceptions of a witness here and there, the credible substance of the testimony shows that John Compton can

and does and has worked with Frank and Leslie Wier, yet Mary Dean and Frank and Leslie Wier - - and the Court is not prepared to say who is at fault - - but they can't stand to be in the presence of each other, can't stand to talk to each other over the telephone, and that's clearly a finding on the Court's part.

Now, the child support: Even though John Compton will have joint custody, since physical custody will remain with the Wiers, John Compton must continue to pay child support and Mary Dean must continue to pay child support.

The Court will leave open the determination as to the amount of child support to be paid and is going to deviate from the guidelines because of the extensive summer visitation and because of what the Court earlier found to be an exceptional financial load that Ms. Dean is already subject to. The Court does not want to pile more misery on top of her. The Court does not know how she is surviving financially, at the moment, and really has serious doubt as to what her income is.

It is critical that John Compton and Mary Dean have appropriate visitation. I do believe Mary Dean - - its [sic] fine for her to visit with these boys, its [sic] fine for them to visit with her, in her home wherever she lives in Wilmington, North Carolina. The Court sees no need for visitation to be limited to Sevierville, as it was early on. That was not initially this Court's ruling, this Court just followed the previous ruling and has since changed that.

The boys love their mother; they both told the Court, separately, that they love their mother; they both told the Court, separately, that they love their father; and they both told the Court that they love their the Grandparents, the Wiers and Mrs. Doris Compton, as well.

The Court thinks that the boys are fortunate to have all these good people who love them, but with the mother, the father and the Wiers living in three separate cities, in separate states, the Court has to respect the fact that they can only be one place most of the time. Therefore, they will remain in Sevierville and this custody order is a final order.

\* \* \*

The Court has made what it believes is an important finding and that is that - - they love their mother, they want to be with their mother, they love their father, they want to be with their father, and the Court thinks lengthy visitation would be appropriate.

The Court thinks it is critical that primary custody be with the Wiers because of the stability of the relationship, the benefits they're receiving and, candidly, the Court is convinced that neither parent can raise these boys on their own.

Consequently, the trial court ordered that joint custody of the children be awarded to Father together with the Grandparents. Primary custody of the children, as well as sole physical custody, was awarded to the Grandparents. The order set forth a detailed visitation schedule for Mother and Father, and ordered Mother and Father to pay child support to the Grandparents. The trial court issued a subsequent order assessing liability for the Grandparents' attorney's fees and expenses as follows: 25% to the Grandparents, 25% to Father, and 50% to Mother. From these two orders, Mother and Father now appeal.

On appeal, Mother argues that the trial court erred in awarding joint custody of the children to Father and the Grandparents. She claims that, while the trial court found her not credible and

13

criticized the handling of her financial affairs, it did not explicitly find that she had exposed the children to substantial harm or that she would do so. Mother asserts that such a finding is necessary to support an award of custody to the Grandparents.

Mother also argues that the trial court erred in awarding joint custody to Father. She asserts that Father is unfit because he failed to play an active role in the children's lives since they were placed in the Grandparents' custody, he lacks the financial means or emotional ability to care for the children, and because of his past problems with alcohol. She argues that the trial court's award to Father was intended as a reward for his efforts to rehabilitate himself and that this is impermissible under Tennessee law.

Father argues that the trial court erred in awarding joint custody to the Grandparents, and maintains that he should have been awarded sole custody of the children. Father claims that there was no evidence at trial demonstrating that he is unfit or that granting him custody of the children would result in substantial harm to them. He argues that such a finding is necessary to support an award of custody to the Grandparents.

The Grandparents maintain that the trial court was correct in granting them physical custody of the children. They assert that the trial court implicitly found that an award of physical custody to either Mother or Father alone would result in substantial harm to the children. They contend that the trial court awarded Father joint custody because he offered at the outset of trial to share custody with the Grandparents and because Father could work with the Grandparents on matters involving the children.

Tennessee courts have long recognized that "the right of a parent is superior in a custody dispute between a parent and a third party." *See Doles v. Doles*, 848 S.W.2d 656, 660 (Tenn. Ct. App. 1992). In a contest between a natural parent and a non-parent, the parent cannot be deprived of custody of the child unless there has been a finding, after notice required by due process, that substantial harm threatens the child's welfare if custody is given to the parent. *See In re Askew* (*Lewis v. Donoho*), 993 S.W.2d 1, 4 (Tenn. 1999) ("*Askew*"); *see also In re Adoption of Female Child* (*Bond v. McKenzie*), 896 S.W.2d 546, 548, (Tenn. 1995) ("*Bond*"). Sufficient grounds for a non-parent to seek custody of a child might include unfitness of the parent and dependency and neglect of the child. *See Askew* at 3-5.

14

In *Askew*, the mother had asked a third party to care for her child when the child was quite young. *Id.*, 993 S.W.2d at 1. In a "perfunctory order," the juvenile court awarded custody of the child to the third party based on the fact that the child had been living with the third party. There was no allegation or finding of unfitness or dependency and neglect. *See id.* at 2, n. 2. Shortly thereafter, the mother petitioned for custody of the child. After a hearing on the mother's petition, the juvenile court awarded "temporary custody" of the child to the third party, but noted that it was only "delaying restoring custody to the natural parents" until the mother demonstrated she was able to care for the child. *Id.* at 2. The order was not appealed, but several years later was challenged in court by the mother.

In its analysis, the Tennessee Supreme Court in *Askew* emphasized that "a natural parent may only be deprived of custody of a child upon a showing of substantial harm to the child." *Id.* at 4. The Court noted that the juvenile court order contained "neither an explicit nor implicit finding of substantial harm," and that the order termed the custody awarded "temporary" and stated that the juvenile court was "only delaying restoring custody" to the mother. *Id.* The Court stated:

> The magnitude of a parent's constitutional right to rear and have custody of his or her children would necessitate a clear finding of substantial harm.
>
> * * *
>
> It appears that no valid determination was ever made that [the mother's] custody of [the child] would result in "substantial harm" to the child. Absent such a finding, we conclude that the deprivation of the custody of her child has resulted in an abridgement of [the mother's] fundamental right to privacy.

*Id.* at 4-5 (citations omitted). The facts in this case must be analyzed in accordance with the principles set forth in *Askew*.

We must first determine whether the order on appeal, the Probate Court's September 1998 order, was an initial custody determination or the denial of a request for modification of a final custody award. In order to do so, we must examine the earlier custody orders. While Mother filed repeated petitions regarding custody, the primary custody orders to be examined, prior to the order on appeal here, are the September 1991 order and the March 1995 order.

Unlike *Askew*, the September 1991 order was preceded by a request for permanent custody by the Grandparents and an allegation that both Mother and Father had failed to provide for the children, forcing the Grandparents to assume responsibility for them. Unlike *Askew*, the September 1991 order was an agreed order which did not term the award of custody to the Grandparents as "temporary." However, perhaps because the order was an agreed order, it did not contain an explicit

finding that either Mother or Father was unfit, that the children had been dependent and neglected, or that substantial harm would result from an award of custody to either Mother or Father.

As noted above, following this order, Mother continued to seek custody. Her petitions resulted in the March 1995 order. Again, unlike *Askew*, the March 1995 order was preceded by pleadings filed by both Father and the Grandparents alleging that Mother was unfit and that substantial harm would result from an award of custody to her.[1] As with the September 1991 order, the award of custody was not termed "temporary" and was not appealed. However, it was an agreed order that did not contain an express finding that Mother was unfit, that the children had been dependent and neglected, or that substantial harm would result from an award of custody to Mother. In fact, the March 1995 order stated that the parties agreed to a mediation process and to work toward a situation in which "the children's best interests would be served by having [Mother] serve in the role of primary custodian for the children."

A valid argument could be made that both the September 1991 order and the March 1995 order implicitly found that substantial harm would result to the children from an award of custody to Mother. Both were preceded by allegations of substantial harm, even if the term "substantial harm" was not used, and the parties had the opportunity for a full hearing; indeed, for both orders, agreement was reached only after the hearing commenced. Both are agreed orders which, in the interest of facilitating agreement, are unlikely to state expressly that Mother is unfit or that substantial harm would result from an award of custody to Mother.[2]

Nevertheless, as in *Askew*, the March 1995 order alludes to Mother later regaining custody of the children, albeit in language less strong than that used in *Askew*. While the trial court in this case did not state that it was merely "delaying restoring custody" to Mother or Father, it included a provision for the parties to participate in mediation to work toward a situation in which "the children's best interests would be served by having [Mother] serve in the role of primary custodian.…" *Askew*, 993 S.W.2d at 4. Moreover, no finding of substantial harm was explicitly made in either the September 1991 order or the March 1995 order. *See id.* at 4-5. Consequently,

---

[1]Father did not seek custody at that time.

[2]If such an express statement were required in a consent order granting custody to a third party, it would be difficult for such matters to be resolved by agreement, without a full hearing and judicial resolution.

16

for purposes of analysis, we will assume, without finding, that the September 1998 order at issue in this case is the initial order of permanent custody.

While the September 1998 order awards joint custody of the children to Father and the Grandparents, the Grandparents are designated the primary custodians and were awarded physical custody. Both Mother and Father were awarded substantial visitation. Since the Grandparents are the primary custodians and the sole physical custodians, for purposes of analysis, we assume, without finding, that the September 1998 order should be analyzed as an award of custody to the Grandparents, even though Father was awarded joint custody. The award to Father will be discussed after the analysis of the award to the Grandparents.

As noted above, in a dispute between a parent and a non-parent, even if the non-parent is a grandparent, "a parent cannot be deprived of the custody of a child unless there has been a finding. . . of substantial harm to the child." *Askew*, 993 S.W.2d at 4; *see also Bond*, 896 S.W.2d at 548. This may include a finding that the parents are unfit or that the child is dependant and neglected. *See Askew*, 993 S.W.2d at 4. Once such a finding has been made, the trial court may evaluate custody in light of the best interests of the child. *See Askew*, 993 S.W.2d at 4; *see also Bond*, 896 S.W.2d at 548.

In this case, although the trial court did not use the terms "unfit" and "substantial harm," it is clear that the trial court concluded that Mother was unable to adequately care for Frank and Gabriel and that an award of custody to her would result in substantial harm. The trial court stated in its oral ruling that it had "little faith" in anything Mother said, and expressly found that her trial testimony lacked credibility. The trial court stated that Mother "doesn't act responsibly," that she is unable to manage her financial, tax, business or personal affairs, and that "she is simply not the proper person to have custody of these children on a full time basis." It emphasized that these children had to "have an adult who acts responsibly, who is responsible for their day-to-day care." While the trial court noted that it was not finding that Mother is "a bad person," its findings amount to a conclusion that Mother is unfit.

The language used by the trial court as to Father was more charitable, but its conclusion that Father was unable to adequately care for the children was equally clear. The trial court noted that Father had done much to rehabilitate himself and was "a good parent or [was] capable of being a good parent." Nevertheless, the trial court concluded that, at the time of trial, Father did not "have

17

the means, the residence, the facilities, the economic where-with-all and, perhaps, not the emotional stamina to be the full-time custodian of his children." The trial judge did not believe that Father could maintain a full-time job, living in Cheatham County, with his mother living in east Nashville, and provide everything that these children needed. The trial court emphasized that it was "convinced that neither parent can raise these boys on their own." Thus, while the trial court observed that Father's circumstances had improved, it considered the boys' special needs and concluded that Father could not meet them. This amounts to a conclusion that Father is unfit to be custodian of these children, and that substantial harm would result from an award of custody to Father. Therefore, as required in *Askew*, the trial court determined that an award of custody to either Mother or Father would result in substantial harm to these special needs children.

Mother asserts on appeal that the evidence presented at trial preponderates against a finding that she is unfit or that substantial harm would result from an award of custody to her. To the contrary, the record supports the trial court's conclusion that Mother lacked credibility and was unable to manage her affairs.

The record indicates that Mother misrepresented to the guardian *ad litem* and to the trial court that she was in a stable relationship with her former husband, Dean, when she later indicated that it was an abusive relationship. Not only did she fail to make any substantial child support payments for many years, the record indicates that she took affirmative steps to avoid paying it, such as incorporating her insurance business in order to avoid garnishment. At a time when Mother had numerous substantial financial troubles, she obligated herself to purchase a $157,000 home in order to make it appear that she had appropriate living quarters for herself and the children. The trial court was faced with an array of conflicting testimony, affidavits and documentary evidence from Mother, as though Mother sought to prevent the trial court from seeing her true circumstances, rather than simply presenting an accurate picture of her situation. Mother's efforts appear more actuated by the desire to improve her legal posture in these proceedings than by a genuine desire to provide a stable home for her children. Her problems were more than simply a lack of money. The trial court observed that "the poorest people can be wonderful parents. . . . You can not have a dime and be a great parent," but it concluded that the evidence indicated that Mother does not "act responsibly" and is "unable to manage her affairs." The trial court can and should consider Mother's persistent lack of credibility in assessing her fitness as a custodian. A consistent pattern of deception and

dishonesty reflects on a parent's fitness as a custodian. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 634 (Tenn. Ct. App. 1996). While it is ironic that some of Mother's lack of veracity and irresponsible actions stem from her efforts to present a facade of ability to care for the children, the record fully supports the trial court's conclusions.

Moreover, the trial court's decision was based in part on the special needs of these children. Considering Gabriel's cerebral palsy and Frank's psychological problems, the guardian *ad litem* observed that "the time and attention necessary to provide these two boys with the medical care and attention they require is extraordinary." Given the boys' extensive medical requirements, the guardian *ad litem* felt that it would not be possible for a single parent to work outside the home and attend to their needs. After observing that Mother consistently "acted irresponsibly," the trial court emphasized that these children particularly needed to "have an adult who acts responsibly, who is responsible for their day-to-day care." In determining whether substantial harm would result to the children from an award of custody to Mother, the trial court can and should take into account the special needs of the children and Mother's ability to meet those special needs. The special needs of the children have long been considered in assessing the comparative fitness of divorcing parents in order to determine the custody of the parties' children. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996) (quoting *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983)). The children's special needs are also considered in determining whether parents are unfit or unsuitable to have custody of minor children and whether custody should be awarded to a third party. *See, e.g., In re Marriage of Powell*, 948 S.W.2d 153, 157-158 (Mo. Ct. App. 1997). In *Powell*, the mother of two minor children had left them in the care of her parents, and the father sought custody. One of the children had autism and required regular therapy; the other child was hyperactive and had possible learning disorders and received counseling and medical treatment for his problems. *See id.* at 155, 157. The children had lived with the maternal grandparents most of the four years since the parents' divorce. *See id.* at 157. In contrast to the parents, the maternal grandparents had provided a stable home environment and had obtained the educational and developmental resources to meet the children's special needs. *See id.* While the standard for awarding custody to a third party in *Powell* was statutory and different in some respects from the standard set forth in *Askew*, Powell demonstrates the necessity of considering the children's special needs. *See Powell*, 948 S.W.2d at 157; *and see Askew*, 993 S.W.2d at 4. In this case, considering the special needs of Frank and

19

Gabriel as well as the evidence as a whole, and giving appropriate deference to the trial court's determinations of credibility, we cannot conclude that the evidence preponderates against the conclusion that substantial harm would result to these children from an award of custody to Mother.

Mother also asserts on appeal that the trial court erred in awarding joint custody to Father. Father asserts on appeal that the trial court erred in not awarding him sole custody of the children, without jointly sharing custody with the Grandparents. Since Father told the trial court that he recognized that the Grandparents had been the children's primary caretakers and would agree to an award of "shared" custody with the Grandparents, Father has waived this issue on appeal. *See State Dept. of Human Services v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). Nevertheless, the issue raised by Father will be addressed in the course of discussing Mother's argument that Father should not have been awarded joint custody with the Grandparents.

In her argument, Mother notes Father's history as an alcoholic and the fact that he ceased visiting the children from 1995 to 1998, for the sake of his own mental health. At the time of trial, Father lived in a one-bedroom trailer in Cheatham County, Tennessee. He testified that he was building a house suitable for himself and the children, but he had been building the house for a period of five years and, with a net income of approximately $12,000 per year, had extremely limited means for completing it. Father's testimony on whether the children would be covered by medical insurance was uncertain at best, and his firsthand knowledge of the children's extensive needs and expenses was quite limited.

Nevertheless, Father testified that he had not consumed alcohol since December 1997, and no evidence to the contrary was presented. His self-employment as an electrical contractor seemed reasonably stable, and he had forged a cooperative relationship with the Grandparents. In his testimony, Father acknowledged that he would not be able to adequately care for the boys by himself, but would seek assistance from Mother, living in North Carolina, from the Grandparents, living in Sevierville, Tennessee, and from his mother, living in east Nashville.

In sum, the evidence supports the trial court's conclusion that, in comparison to Mother, Father was more stable and responsible. Nevertheless, while Father was barely able to meet his own needs, the evidence in the record shows that he was clearly without the resources, financial, emotional, time, support and otherwise, to adequately care for these special needs children. The evidence supports the finding that awarding sole custody of the children to Father would result in

20

substantial harm to the children. Indeed, this case presents a close question as to whether the trial court erred in failing to grant sole custody, physical and otherwise, to the Grandparents.

Once there has been a valid finding that an award of custody to the parent would result in substantial harm to the children, the trial court must "engage in a general 'best interest of the child' evaluation in making a determination of custody." *Askew*, 993 S.W.2d at 4 (quoting **Bond**, 896 S.W.2d at 548). In this case, the trial court determined that the children's best interests were served by an award of joint custody to Father and the Grandparents, with primary custody and sole physical custody awarded to the Grandparents.

The evidence clearly supports the trial court's decision that the children's best interests would not be served by an award of custody, joint or otherwise, to Mother. As noted above, the evidence showed that Mother is unwilling or unable to responsibly manage her own affairs and is unable to adequately care for Frank and Gabriel's special needs. The children's psychologist, Dr. Wahler, testified about the importance of honesty and consistency in parenting the children, and the trial court could consider Mother's lack of credibility and inconsistent testimony in determining custody. Moreover, the record is replete with evidence of Mother's poisonous relationship with the Grandparents. Dr. Wahler testified that the person with custody of Frank and Gabriel should have "a strong working relationship" with the Grandparents. Under these circumstances, the evidence does not preponderate against the trial court's decision not to award custody to Mother.

Likewise, the evidence fully supports the trial court's decision to award primary custody and sole physical custody to the Grandparents. The record indicates that the Grandparents had done a good job meeting the extraordinary needs of these children. In making his report, the guardian *ad litem* noted that both the Grandparents had given up occupations in order to devote the time and attention needed to care for Frank and Gabriel, and observed that the Grandparents had given the boys "tremendous love and support" as well as "an almost unlimited amount of professional assistance and treatment. . . ." In addition, while Mother and the Grandparents remained estranged, the Grandparents had forged a cooperative relationship with Father.

Furthermore, Dr. Wahler testified about the difficulties for the boys in changing custody, and emphasized that both boys needed stability and continuity. Dr. Wahler noted Gabriel's obvious physical difficulties and the ensuing psychological problems. He also emphasized that continuity and stability were particularly crucial for Frank, and commented that the Grandparents had provided

21

such continuity and stability in the face of considerable difficulties. While this is a dispute between parents and non-parents, and we treat the order on appeal as an initial grant of permanent custody, in assessing the best interests of the children the trial court was not required to turn a blind eye to the fact that the boys had resided with the Grandparents for nine years, for most of their lives, and could consider the factor of continuity in assessing the children's best interests. We are mindful that the subject matter of this lawsuit is not abstract legal principles but real children who would be deeply affected by removing them from the persons who have been their primary caregivers virtually all of their lives. The award of primary custody and sole physical custody to the Grandparents is affirmed.

A close question is presented on whether the trial court erred in granting joint custody to Father, since Father is clearly unable to meet the special needs of these children. However, Father has rehabilitated and become reasonable stable, and has forged a cooperative working relationship with the Grandparents. In deference to the trial court's assessment of credibility and the demeanor of the parties, we cannot say that the evidence preponderates against the trial court's award of joint custody to Father, within the parameters established by the trial court, with the Grandparents having primary custody and sole physical custody. Therefore, the award of joint custody to Father is affirmed.

Finally, both Mother and Father argue that the trial court erred in ordering that they pay part of the Grandparents' attorney's fees. Mother asserts that she should not have been assessed the Grandparents' attorney's fees because the Grandparents did not request that attorney's fees be assessed against her in either of their two intervening petitions. Father argues that the trial court should not have assessed fees against him because he was a prevailing party at trial.

Tennessee Code Annotated § 36-5-103(c) states that the person to whom custody is awarded may recover reasonable attorney's fees incurred in any action concerning an initial adjudication of custody or a subsequent change in custody. Tenn. Code Ann. § 36-5-103(c) (Supp. 1999). The decision to make an award of attorney's fees rests within the sound discretion of the trial court. *See Richardson v. Richardson*, 969 S.W.2d 931, 936 (Tenn. Ct. App. 1997).

Mother's conduct during this case forced the Grandparents to bear the cost of countless motions and petitions. The trial court found Mother to have had a long history of obstructive conduct and of noncompliance with court orders. In addition, although Father arguably prevailed

22

at trial, the trial court's award of attorney's fees against him is not barred by Section 36-5-103(c). Neither award is an abuse of the trial court's discretion. The award of attorney's fees against both Mother and Father is affirmed.

In summary, we affirm the trial court's award of joint custody to Father and the Grandparents, with primary custody and sole physical custody to the Grandparents. We affirm the trial court's denial of custody to Mother. We also affirm the trial court's award of attorney's fees against Mother and Father.

The decision of the trial court is affirmed. Costs are taxed to the Appellant, Mary Wier Compton Dean, and to the Appellee, John Compton, for which execution may issue if necessary.

_____
**HOLLY KIRBY LILLARD, J.**

_____
**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**DAVID R. FARMER, J.**

23